# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) |
|---|---|
| | ) |
| v. | ) |
| | ) 2:18-cr-00124-JDL |
| GREGORY MARTIN, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

Gregory Martin is charged with possessing a controlled substance with the intent to distribute, in violation of 21 U.S.C.A. § 841(a)(1) (West 2019). Martin seeks to suppress all evidence and statements obtained as a result of a traffic stop and subsequent dog sniff of a vehicle in which Martin was a passenger. *See* ECF No. 36. For the reasons that follow, the motion is **DENIED**.

### I. FACTUAL BACKGROUND

On the night of June 1, 2018, while patrolling the Maine turnpike near the York toll plaza, Trooper John Darcy of the Maine State Police observed a vehicle driving erratically. The vehicle's speed was fluctuating between 50 miles per hour and 70 miles per hour (the speed limit), it was randomly braking without any apparent cause, and it was weaving from side to side within its lane. Trooper Darcy followed the vehicle for approximately 25 miles. At some point during this time, Trooper Darcy called his partner, Trooper Jesse Duda, to tell him that he would be stopping a vehicle showing signs of an impaired driver. At roughly 11:33 p.m., after he observed the vehicle again weave in its lane, this time drifting onto the center line,

Trooper Darcy initiated a traffic stop. Trooper Darcy turned on his dashcam roughly one minute prior to initiating the stop.

After the vehicle had pulled over, Trooper Darcy approached and informed the female driver that he had observed driving behavior which led him to think she might be impaired. In response to Trooper Darcy's questions, the driver indicated that she was not under the influence of any drugs or alcohol and had not been distracted, but that she was tired. Trooper Darcy then asked for her driver's license and for identification from Martin, the passenger in the front seat.

Trooper Duda arrived at the scene approximately 90 seconds after the traffic stop commenced and approached the passenger side of the stopped vehicle. As Trooper Duda reached the front passenger side window, Martin handed Trooper Darcy a Maine driver's license bearing the name "Micheal Cohen." Because the driver did not have any identification on her, Trooper Darcy asked her to exit the vehicle and come to his police cruiser so she could provide her name and birth date while he located her in the Bureau of Motor Vehicles ("BMV") database.

While Trooper Darcy took the driver's name and birth date, he also asked about what she and Martin had been doing that day. She stated that they had been shopping in New Hampshire. Trooper Darcy had no trouble locating the driver in the BMV database and determining that she had a valid driver's license. Trooper Darcy could not, however, find any matches for the name "Micheal Cohen" with the given birthday in the database, and, roughly 6 minutes and 10 seconds into the traffic stop, asked aloud whether the license Martin had provided was fake. Trooper Darcy then asked the driver what Martin's name was and how it was spelled: she answered

"Michael Cohen" with "Michael" spelled differently than on his license. She did not know his date of birth. Shortly afterward, Trooper Duda told Trooper Darcy to check in the New York BMV database. Martin then provided a New York license with the same date of birth but spelling his name "Michael Cohen." Trooper Darcy could not find either a "Micheal Cohen" or a "Michael Cohen" with the given date of birth in either Maine or New York. Trooper Darcy again wondered aloud whether the licenses were fake, and Trooper Duda asked the driver if Martin was lying to them. She said he was not.

Roughly ten minutes into the traffic stop, Officer Duda asked Martin to step outside the vehicle to conduct a patdown search for weapons based on his concern that Martin had provided fake identification. Trooper Darcy proceeded to question Martin about his licenses, asking him if they were fake. When asked his date of birth, Martin gave a different date—January 26, 1978—than that listed on the two licenses (August 25, 1978).

Roughly 12 minutes and 45 seconds into the traffic stop, while Trooper Darcy returned to his cruiser to search for Martin's identity using the new birthday Martin had provided, Trooper Duda began a dog sniff of the vehicle with his trained K-9 partner, "Mack," who had been in Trooper Duda's cruiser. After Trooper Darcy still could not locate "Cohen" in the Maine and New York BMV databases, he again asked Martin for his date of birth, at which point Martin provided a third date: January 26, 1976. After Trooper Darcy still could not locate "Cohen," and again accused Martin of providing fake identifications, Martin stated that his actual name was

"Jamel Martin." Trooper Duda and Mack completed the dog sniff of the vehicle at almost the exact same moment.

Mack alerted twice on the trunk of the vehicle during the dog sniff indicating a positive response for the presence of drugs. During the next half hour, the troopers searched the vehicle, but found no contraband. Trooper Darcy also searched Martin during this time, finding nothing. Approximately 50 minutes into the stop, Trooper Duda noticed a bulge in Martin's pants, which he thought could be narcotics. At this point Trooper Darcy handcuffed Martin and searched him again, still finding nothing.

Approximately an hour and 13 minutes into the stop, Trooper Darcy read Martin the *Miranda* warnings in the front seat of his cruiser because he wanted to ask Martin questions. Roughly seven minutes later, the troopers informed Martin that they had located narcotics in an iced tea container in the car. Approximately one hour and 23 minutes into the stop, Martin asked Trooper Darcy: "So why is [the driver] getting arrested for? It's all mine." Gov. Ex. 1 at 1:23:57. Roughly a minute later, after Trooper Darcy asked him if they could "sort out what really went down," Martin said "[the driver] had nothing to do with it, that's for sure." *Id*. at 1:25:05-1:25:15. Trooper Darcy then asked, "all you?", to which Martin responded, "all me." *Id*. Martin made several other statements indicating that the driver knew nothing about the drugs. *Id*. at 1:25:16-1:25:30. Martin and the driver were subsequently taken into custody and transported to the State Police barracks in Portland where, in response to questioning, Martin admitted to purchasing $10,000 of crack cocaine in New York to bring back to Maine. He also admitted to being Gregory Martin, not Jamel Martin.

4

## II. LEGAL ANALYSIS

Martin argues, first, that the traffic stop of the vehicle that he was a passenger in was an unreasonable search and seizure under the Fourth Amendment because there was no reasonable suspicion for stopping the vehicle, and that all evidence discovered during and as a result of that search must be suppressed. Second, Martin argues that the traffic stop was unreasonably extended to allow for the dog sniff, which was not supported by reasonable suspicion, and that any evidence discovered thereafter must be suppressed. Third, Martin argues that the narcotics detection canine did not follow proper protocols and, as a result, there was no probable cause to conduct a warrantless search of the vehicle. Finally, Martin contends that because he did not receive *Miranda* warnings when he was initially handcuffed, any subsequent statements he made must be suppressed. *See generally Miranda v. Arizona*, 384 U.S. 436 (1966).

### A. The Initial Traffic Stop

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "It is common ground that a traffic stop constitutes a seizure of both the stopped vehicle and its occupants for Fourth Amendment purposes." *United States v. Arnott*, 758 F.3d 40, 43 (1st Cir. 2014). Because "[a] traffic stop constitutes a seizure of 'everyone in the vehicle' for purposes of the Fourth Amendment," it "must be supported by reasonable suspicion that a traffic violation has occurred." *United States v. Chaney*, 584 F.3d 20, 24 (1st Cir. 2009) (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007)). In determining

whether Trooper Darcy had reasonable suspicion to initiate a traffic stop of the vehicle in which Martin was a passenger, I consider the "totality of the circumstances" to see whether Trooper Darcy had a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation mark omitted).

As Martin argues, Trooper Darcy does not claim that he observed the vehicle violate any traffic laws. It is also apparent that the one instance of erratic driving captured on video—weaving onto the highway center line—can be explained by a sharp zig-zag in the road caused by roadside construction. However, the Government provided uncontradicted testimony that Trooper Darcy personally observed the vehicle repeatedly fluctuate speeds, brake randomly, and weave side to side within its lane over the course of roughly 25 miles. Taken together, and considering it was late at night, it was reasonable for Trooper Darcy to suspect that the driver could be impaired. *See Blackstone v. Quirino*, 309 F. Supp. 2d 117, 126 (D. Me. 2004) ("When an officer observes a vehicle weaving within a lane of travel and swerving across a lane dividing line, he or she obtains more than a mere hunch that criminal activity may be occurring, assuming that weather, road conditions or other extenuating circumstances do not explain such driving."); *United States v. Harmon*, 742 F.3d 451, 458 (10th Cir. 2014) (police had reasonable suspicion to stop defendant's vehicle on suspicion of impairment, where officer observed vehicle weaving and, in one instance, crossing fog line with front and rear passenger wheels); *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1120-21 (9th Cir. 2003) (swerving within one's own lane of traffic supported reasonable suspicion that defendant was impaired); *Babers v. City*

*of Tallassee, Ala.*, 152 F. Supp. 2d 1298, 1305 (M.D. Ala. 2001) (driver braking erratically and then speeding up for no apparent reason on a highway at 1:30 a.m. provided officer with reasonable suspicion to stop driver of vehicle for driving under the influence). Thus, the initial traffic stop was supported by the constitutionally required reasonable suspicion.

**B.    The Dog Sniff**

"A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Illinois v. Caballes*, 543 U.S. 405, 410 (2005). The Supreme Court has elaborated, however, that "absent the reasonable suspicion ordinarily demanded to justify detaining an individual, a police officer may not prolong a traffic stop to conduct a K-9 sniff beyond the time necessary to handle the traffic violation that justified the stop." *United States v. Ramdihall*, 859 F.3d 80, 90 (1st Cir. 2017) (internal quotation marks omitted) (quoting *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015)). Here, neither Trooper Darcy or Trooper Duda testified that there was reasonable suspicion that there were drugs in the vehicle prior to the dog sniff that would have allowed them to detain the vehicle and its occupants on that basis, and I find that no such reasonable suspicion existed. Thus, the constitutionality of the dog sniff turns on whether it prolonged the traffic stop. If it did not prolong the stop, no additional reasonable suspicion was necessary.

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez*, 135 S. Ct. at 1614

7

(internal citations omitted). Here, the mission of the traffic stop was to determine whether the driver was impaired. Although Trooper Darcy testified that he was concerned that the driver was tired, the dashcam footage indicates that he quickly dispelled his suspicion that the driver was impaired. Nonetheless, "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615 (internal quotation marks and citation omitted). An officer may also request identification from passengers in a vehicle, *United States v. Fernandez*, 600 F.3d 56, 61 (1st Cir. 2010) ("Although the [Supreme] Court has not explicitly held that an inquiry into a *passenger's* identity is permissible, its precedent inevitably leads to that conclusion."), so long as the request "do[es] not measurably extend the duration of the stop." *United States v. Chaney*, 584 F.3d 20, 24 (1st Cir. 2009).

Trooper Darcy asked for both the driver's and Martin's identification. The driver did not have a license on her and so she accompanied Trooper Darcy to his cruiser so that he could determine whether she was in the BMV database. Martin promptly provided a Maine driver's license. Both requests for identification were permissible as ordinary inquiries incident to the stop. Having permissibly requested Martin's identification, Trooper Darcy quickly developed reasonable suspicion that Martin had provided false identification, and therefore might be involved in criminal activity, when he could not find "Micheal Cohen" with the date of birth provided by Martin in the BMV database, which justified further investigation. *See Ramdihall*,

8

859 F.3d at 90 ("Reasonable suspicion may . . . develop during the course of an ordinary traffic stop so as to justify extending the seizure beyond the time needed to accomplish its original purpose."); *Chaney*, 584 F.3d at 26 (where there was reasonable suspicion that passenger was giving a false name during a traffic stop, it was reasonable to undertake further investigation to determine his identity). Martin's subsequent actions and statements created even more cause for reasonable suspicion: he provided a New York license with his name spelled differently, then provided two different dates of birth, and then admitted to having a different name.

The First Circuit's decision in *United States v. Clark*, 879 F.3d 1 (1st Cir. 2018), is instructive. There, a passenger of a vehicle stopped for a traffic violation moved to suppress drug evidence found on his person, arguing that the police officer unreasonably extended the duration of the traffic stop to inquire into his identity. *Id.* at 2. Upon stopping the vehicle, the officer requested identification from both the driver and the defendant, who was the only passenger. *Id.* The driver provided a license and the defendant volunteered his name, date of birth, social security number, and age, but didn't have identification on him. *Id.* at 2-3. The officer returned to his cruiser to verify the vehicle occupants' identities. *Id.* at 3. As was true here, the officer could not locate the defendant in the database, which led the officer to suspect that he was trying to conceal his identity. *Id.* Six-and-a-half minutes into the stop, the officer returned to the vehicle to confirm the defendant's information. *Id.* After a minute of additional questioning, the defendant provided two different dates of birth, both of which were different than the one he originally provided. *Id.* The parties agreed that once the defendant provided inconsistent birth dates, the officer

9

had reasonable suspicion to prolong the stop and continue questioning him. *Id.* at 5. Therefore, the defendant's challenge focused on the additional minute of questioning before he provided the birth dates. *Id.* The court held that the officer's additional minute of questioning did not violate the defendant's Fourth Amendment rights. *Id.* "Asking a passenger, for one minute, to confirm identifying information he has already volunteered to the officer is one of [the] negligibly burdensome precautions justified by the unique safety threat posed by traffic stops." *Id.* The situation here is closely analogous: Martin provided an additional, and inconsistent, license roughly seven and a half minutes into the stop while Trooper Darcy was still trying to locate him in the BMV database. Thus, as in *Clark*, the initial inquiry into Martin's identity did not prolong the stop in violation of the Fourth Amendment and it quickly generated independent reasonable suspicion to continue the investigation.

The dog sniff began roughly 12 minutes and 45 seconds into the traffic stop. At that point, Martin had provided two driver's licenses that spelled his name differently and had verbally provided a separate birth date that did not match either license. The dog sniff therefore began after reasonable suspicion had developed that Martin was concealing his identity. The dog sniff concluded roughly seven minutes later, while Trooper Darcy was still investigating Martin's identity. In fact, the dog sniff ended at almost exactly the same moment that Martin admitted to not being "Micheal Cohen." The dog sniff of the vehicle therefore did not unlawfully prolong the traffic stop, and the vehicle was legitimately within the trooper's custody as part of a lawful traffic stop at the time of the dog sniff. Because "[a] canine sniff of the exterior of a vehicle which is legitimately within the custody of the police is not a

search within the meaning of the fourth amendment," the troopers did not need reasonable suspicion that there were drugs in the vehicle to conduct the dog sniff. Thus, the dog sniff was lawful.

**C.     The Vehicle Search**

Mack's positive alert to the trunk of the vehicle provided the troopers with probable cause to conduct a warrantless search of the vehicle. *United States v. Brown*, 500 F.3d 48, 57 (1st Cir. 2007) ("[A] reliable canine sniff outside a vehicle can provide probable cause to search the vehicle."). "The existence of probable cause based on an alert by a drug dog depends upon the dog's reliability." *United States v. Owens*, 167 F.3d 739, 749 (1st Cir. 1999). Although Martin initially challenged Mack's reliability and training, he withdrew that challenge at the suppression hearing. Nonetheless, based on the testimony offered at the suppression hearing, I find that Trooper Duda and Mack were adequately trained and certified in K-9 narcotics handling and detection. However, "even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." *Florida v. Harris*, 568 U.S. 237, 247 (2013). Martin alleges that Trooper Duda impermissibly cued Mack during the dog sniff.

In evaluating this challenge, the Supreme Court instructs a court to weigh the competing evidence. *Id.* at 248. Ultimately, "[t]he question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think

that a search would reveal contraband or evidence of a crime." *Id.* Having viewed the footage from the dashcams of both Trooper Darcy's and Trooper Duda's cruisers, and having heard Trooper Duda's testimony regarding the standards and techniques he employed in conducting the dog sniff, I find no evidence of improper cuing by Trooper Duda, and I conclude that Mack credibly alerted to the trunk of the vehicle. The positive alert therefore provided probable cause for the warrantless search of the vehicle. *Brown*, 500 F.3d at 57.

**D.     The *Miranda* Warnings**

Finally, Martin argues that any statements he made accepting responsibility for the discovered drugs after being placed in custody—which he argues occurred when he was handcuffed roughly 50 minutes into the traffic stop—must be excluded. These statements were made after Martin was read his *Miranda* rights. Nonetheless, Martin argues that a "confession obtained through custodial interrogation after an illegal arrest," even one obtained after reading *Miranda* rights, "should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint." *Taylor v. Alabama*, 457 U.S. 687, 690 (1982) (internal quotation marks omitted).

Martin contends that he was illegally arrested because he was handcuffed roughly 50 minutes into the stop and, he argues, there was no probable cause to arrest at that time. On the contrary, however, although no drugs had been found at that point, Martin had already admitted that his name was not "Micheal Cohen" and thus admitted to having provided false identification and concealing his identity. Thus,

even assuming that handcuffing Martin at that time constituted an arrest, rather than a temporary detention to allow for further police investigation, probable cause existed for that arrest. *See* 29-A M.R.S.A. § 2102(1) (Westlaw through Ch. 79 of 2019 1st Reg. Sess. of 129th Leg.); 17-A M.R.S.A. § 453(1)(B)(3) (Westlaw through Ch. 79 of 2019 1st Reg. Sess. of 129th Leg.); *see also United States v. Medina*, No. 2:16-cr-94-GZS, 2017 WL 1154966, at *5 (D. Me. Mar. 27, 2017) (defendant was not in custody despite being handcuffed for approximately thirty minutes after being pulled over), *Owens*, 167 F.3d at 749 (fifty-minute detention of driver and passenger following stop of automobile for speeding was not so long as to convert investigative stop into de facto arrest, as length of detention was a reasonable product of officers' diligent investigation into the driver's license).

Furthermore, "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda*, 384 U.S. at 478. Martin's initial statement accepting responsibility for the drugs was volunteered spontaneously and not in response to police interrogation, providing a further reason to deny Martin's motion to suppress as to that statement.

### III. CONCLUSION

For the foregoing reasons, Martin's Motion to Suppress (ECF No. 36) is **DENIED.**

**SO ORDERED.**

**Dated this 6th day of June, 2019.**

> /s/ JON D. LEVY
> **CHIEF U.S. DISTRICT JUDGE**