# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| v. | ) | **2:18-cr-00124-JDL-1** |
| | ) | |
| **GREGORY MARTIN,** | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTION FOR COMPASSIONATE RELEASE

On July 1, 2019, Gregory Martin pleaded guilty to one count of possession with intent to distribute cocaine base, in violation of 18 U.S.C.A. § 841(a), (b)(1)(B) (West 2020).  On March 2, 2020, Martin was sentenced to a term of imprisonment of eighty-four months, to be followed by a term of supervised release of four years.  Martin now moves for compassionate release under 18 U.S.C.A. § 3582(c)(1)(A)(i) (West 2020), based on the alleged health risks he faces in his current place of incarceration due to the COVID-19 pandemic (ECF No. 90).  For the reasons that follow, I deny the motion.

## I.  LEGAL STANDARD

The compassionate release statute, as amended by the First Step Act of 2018, Pub. L. No. 115−391, § 603(b), 132 Stat. 5194, 5239−41 (codified at 18 U.S.C.A. § 3582(c)−(d) (West 2020)), permits a court to consider a motion for compassionate release brought by a defendant "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C.A.

§ 3582(c)(1)(A) (West 2020).  Once a court determines that it may consider a defendant's motion, the court may reduce the defendant's sentence if, after considering the factors set forth in 18 U.S.C.A. § 3553(a) (West 2020), it finds that "extraordinary and compelling reasons warrant such a reduction" and "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id.* § 3582(c)(1)(A)(i).

Because the policy statement issued by the Sentencing Commission under the compassionate release statute has not been updated since the enactment of the First Step Act, I have previously determined that I should consider the policy statement but need not strictly apply it when deciding whether to grant compassionate release.[1] *See United States v. Calhoun*, No. 2:15-cr-00056-JDL-1, 2020 U.S. Dist. LEXIS 117527, at *3 (D. Me. July 1, 2020).

## II. ANALYSIS

All parties agree that Martin satisfied the administrative exhaustion requirement before filing his motion for compassionate release.  I therefore turn to the merits of Martin's motion, in which he argues that compassionate release is warranted because his medical history and the conditions at Strafford County House

---

[1] The policy statement provides that compassionate release should only be granted upon a finding that the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C.A. § 3142(g)."  U.S. Sentencing Guidelines Manual § 1B1.13(2) (U.S. Sentencing Comm'n 2018).  Additionally, an application note to the policy statement delineates four categories of "extraordinary and compelling reasons" warranting compassionate release.  *Id.* cmt. n.1.  The first three categories concern the defendant's medical condition, age, and family circumstances respectively.  *See id.*  The fourth is a catchall category encompassing reasons "other than, or in combination with" those outlined in the first three categories, "[a]s determined by the Director of the Bureau of Prisons."  *Id.*

of Corrections ("SCHOC"), where he is being held, place him at a high risk of severe illness or death from COVID-19.

## 1.   Extraordinary and Compelling Reasons

As explained above, a court may only grant compassionate release if it finds that "extraordinary and compelling reasons" warrant a reduction in the defendant's sentence.   18 U.S.C.A. § 3582(c)(1)(A)(i).   Martin asserts that extraordinary and compelling reasons exist in part because he is likely to contract COVID-19 at SCHOC. ECF No. 90 at 8-11.

In a recent class action brought by detainees held at SCHOC, a federal district judge commented that the "jail is run by a highly competent superintendent who has approached this public health emergency with great concern."   *Gomes v. US Dep't of Homeland Sec., Acting Sec'y*, No. 20-CV-453-LM, 2020 WL 2514541, at *1 (D.N.H. May 14, 2020).   In a later order issued on July 1, 2020, the court noted the steps that SCHOC has taken to reduce the risk that the virus will be brought into the facility, the risk that it will spread within the facility, and the risk that it may be present but undetected within the facility.   *Gomes v. US Dep't of Homeland Sec., Acting Sec'y*, No. 20-CV-453-LM, 2020 WL 3577302, at *3-5 (D.N.H. Jul. 1, 2020).   For instance, it noted that SCHOC has: suspended the majority of in-person visits; instituted screening procedures for staff, visitors, and new inmates; required that all new inmates quarantine for fourteen days upon arrival; maintained the facility below capacity; limited contact between inmates in different housing units; provided inmates with cleaning and hygiene products; and incentivized employees to get tested.   *Id.* at *3-6.

The statistics gathered and published by Strafford County also confirm that SCHOC is handling the COVID-10 pandemic appropriately. Testing conducted between September 8 and September 14, 2020 of twenty-six inmates and detainees indicated no positive cases of the virus. *COVID-19 Information,* Strafford Cty., N.H., https://www.co.strafford.nh.us/covid-19-information ("COVID-19 (SARS-CoV2) Informational Update 9/17/2020" section) (last visited Sept. 25, 2020). Twelve employees were also tested, all of whom received negative results. *Id.*

The *Gomes* court did, however, recognize that SCHOC's efforts to reduce the risk of COVID-19 "have not been flawless." *Gomes*, 2020 WL 3577302, at *5. It noted, among other things, the limited ability of incarcerated individuals to physically distance in the facility, inconsistencies with mask wearing, and cleaning procedures that are lacking. The court also stated that testing among asymptomatic inmates was "nonexistent," *id.* at *6, although based on the testing numbers noted above this appears to have been at least partially addressed.

Ultimately, it is indisputable that "despite the laudable leadership of [SCHOC's] superintendent," if COVID-19 enters SCHOC the inmates it houses are at great risk of contracting the virus "due to the nature of the virus and the close quarters of the jail." *Gomes*, 2020 WL 2514541, at *1. However, the recent data from the jail suggests that Martin is not currently at a heightened risk of contracting COVID-19 at SCHOC, which does not weigh toward a finding that extraordinary and compelling reasons exist.

Martin argues that extraordinary and compelling reasons also exist because he is at a heightened risk of severe illness or death from COVID-19 based on three

medical conditions: asthma, hepatitis C, and obesity.  ECF No. 90 at 7.  Martin further argues that he is at a heightened risk of severe illness because he is Black. ECF No. 90 at 15-16.

Martin's medical records reveal a history of chronic asthma.  The COVID-19 guidance issued by the Centers for Disease Control and Prevention ("CDC") notes that individuals with moderate-to-severe asthma may be at a greater risk of severe illness from COVID-19.  *People with Certain Medical Conditions,* Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#asthma (last visited Sept. 25, 2020).  Martin's medical records, however, describe his asthma as "mild" and note that it is well-controlled with his current regimen, although Martin has complained recently of chest pain associated with exertion and of an increased use of his inhaler due to feeling claustrophobic while in isolation due to SCHOC's COVID-19 precautions.

Martin's medical records also confirm that he suffers from hepatitis C.  The CDC currently has "no information about whether people with . . . hepatitis C are at increased risk for getting COVID-19 or having severe COVID-19," although it does note that "people of any age who have serious underlying medical conditions, including people with liver disease, might be at higher risk for severe illness from COVID-19, particularly if the underlying medical conditions are not well controlled." *What To Know About Liver Disease and COVID-19*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

precautions/liver-disease.html (last visited Sept. 25, 2020). Martin does not allege any issues with managing his hepatitis C.

Finally, Martin's medical records note that he has a history of obesity, Martin is 5 feet 5 inches tall and weighs 206 pounds.  His Body Mass Index ("BMI") is 33.9. The CDC classifies obesity—defined as having a BMI of 30 or above—as a factor increasing the risk of severe illness from COVID-19.  *People with Certain Medical Conditions*, *supra*.

While separately Martin's asthma and hepatitis C would likely not rise to the level of extraordinary and compelling reasons, considered in combination with Martin's obesity, Martin's health supports a finding that Martin is at an increased risk of complications should he contract COVID-19. *See Delacruz v. United States*, No. 18-CV-811-LM, 2020 WL 3270503, at *3 (D.N.H. June 17, 2020) (finding extraordinary and compelling reasons where an inmate's mild asthma was viewed in combination with hypertension, a known risk factor for COVID-19).

Martin additionally argues that his race places him at a high risk of COVID-19, noting that the virus infects and kills Black people at disproportionately high rates.  The CDC notes that "[t]here is increasing evidence that some racial and ethnic minority groups are being disproportionately affected by COVID-19," *Health Equity Considerations and Racial and Ethnic Minority Groups*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html (last updated Sept. 25, 2020), and the CDC's statistics show that Black people contract the virus 2.6 times more than white people, are hospitalized 4.7 times more than white people, and die 2.1 times more than white

people, *COVID-19 Hospitalization and Death by Race/Ethnicity*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html (last updated Sept. 25, 2020). However, the CDC points to "inequities in social determinants of heath"—such as discrimination, limited healthcare access, inequities in education and income, disproportionate unemployment rates, high rates of homelessness and crowded housing, and disproportionate representation of racial minority groups in essential jobs—as reasons for the high rates of COVID-19 infections and complications among racial minorities. *Health Equity Considerations and Racial and Ethnic Minority Groups*, *supra*. While the CDC's analysis presents a troubling picture of the impact systemic racism has had on public health in minority communities, it does not suggest that Black individuals are otherwise inherently predisposed to COVID-19 infection and complications. Because Martin is currently incarcerated and should have ready access to healthcare if he needs it, I do not find that Martin's race places him at an increased risk of severe illness from COVID-19.

Ultimately, Martin has not established that SCHOC presents risks beyond those inherent to a congregate living facility, as currently no inmates at the facility are positive for the virus and the facility has put numerous safeguards in place to prevent the virus's transmission. He also has not established that his race puts him at an increased risk of illness should he contract COVID-19. However, Martin's asthma, hepatitis C, and obesity, viewed together, do present extraordinary and compelling reasons supporting his compassionate release.

### 2.    18 U.S.C.A. § 3553(a) Sentencing Factors

Despite the fact that Martin has established extraordinary and compelling reasons, the sentencing factors set forth in § 3553(a) weigh against a sentence reduction.  Martin was convicted of one count of possession with intent to distribute cocaine base, in violation of 18 U.S.C.A. § 841(a), (b)(1)(B).  Specifically, Martin was stopped by a police trooper, and, following a period during which Martin sought to disguise his identity from the police, a K-9 search led to the discovery of a Lipton iced tea container containing 255.3 grams of cocaine base.  This quantity of cocaine base went well beyond what one might find on a street-level drug dealer or user.

In imposing the original sentence in this case, I applied the factors set forth in § 3553(a).  Those factors include the nature and circumstances of the offense, the personal history and characteristics of the defendant, the kinds of sentences available, the Sentencing Guidelines, the need to avoid unwarranted sentencing disparities, and the need to provide restitution.  Further, § 3553(a) requires that the sentence reflect the seriousness of the offense that was committed, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from further crimes, and provide the defendant with needed training, medical care, and other treatment in the most effective way.

At sentencing, I focused on three main factors: the seriousness of the offense, the need to protect the public by adequately deterring Martin from future crimes, and the need to provide Martin with education and training.  I noted that Martin had imported a disturbingly high quantity of drugs into the state of Maine.  I further noted that Congress had established a five-year mandatory minimum sentence for

the offense to account for its seriousness.  Additionally, I found that the public needed to be protected from Martin, and that my sentence should be significant enough to deter Martin from further criminal conduct.  Finally, I found that Martin needed to be incarcerated for a sufficient amount of time to receive an education and ultimately be able to earn a legitimate living.

I also imposed variances due to Martin's personal history involving an extremely dysfunctional childhood, as well as the fact that his past criminal offenses were nonviolent and involved relatively small quantities of drugs.

After weighing all these factors, I imposed a term of imprisonment of 84 months—significantly lower than Martin's initial Guidelines range of 188 months to 235 months—to be followed by four years of supervised release.  Additionally, because Martin had a history of substance abuse, I recommended that he be considered for and complete the 500-Hour Comprehensive Drug Treatment Program during his term of imprisonment.

I now revisit the § 3553(a) factors to determine whether granting compassionate release is appropriate.  I first note that Martin was sentenced on March 2, 2020.  As of today, Martin has served approximately thirty percent of his sentence, or slightly more than two years.[2]

While Martin faces the heightened risk of contracting COVID-19 that is inherent to congregate living facilities, and while he does suffer from asthma,

---

[2]  Martin argues that this court should consider June 1, 2018 as the day that Martin's detention began, because the Judgment entered in this case indicates that his offense ended on June 1, 2018. However, Martin was not arrested until August 2, 2018, at which point his detention began.  I find that the calculation of Martin's sentence correctly reflects the percentage of time he has already served, and that Martin's contention that he arguably "has only 48 months remaining on an 84 month[] sentence" is mathematically inaccurate. ECF No. 95 at 2.

hepatitis C, and obesity, which together increase his risk of complications from COVID-19, I find that these reasons do not outweigh the § 3553(a) factors that informed my sentencing decision. Martin's criminal history reflects that he has been involved in selling drugs at least since age 17. The Revised Presentence Report prepared in Martin's case reported that under the Sentencing Guidelines, Martin had a criminal history score of 11, establishing a criminal history category of V, but that his prior convictions qualified him as a career offender resulting in the highest criminal history category of VI. Crucially, I find that the percentage of time that Martin has served does not reflect the seriousness of his criminal conduct and would not adequately deter him from committing future crimes. I sentenced Martin to a period of incarceration well below the Guidelines range due to his difficult childhood and relatively less serious previous offenses. Reducing that sentence even further would undermine the goals laid out in § 3553(a). Furthermore, the record does not reveal whether Martin has participated in any educational courses or drug programs. While this gap in the record is partially the result of his incarceration at a non-BOP facility, Martin has not demonstrated that he has developed the ability to succeed upon release and reduce his dependence on drugs. Because the goal of providing Martin with needed training and treatment was an important factor when I imposed his sentence, I find that Martin's lack of training and treatment to date further weighs against his release.

Accordingly, after considering all the § 3553(a) factors, I conclude that compassionate release is not warranted.[3]

## III.  CONCLUSION

For the reasons explained above, Martin's motion for compassionate release (ECF No. 90) is **DENIED.**

**SO ORDERED.**

Dated:  September 25, 2020

_____/s/ JON D. LEVY_____
**CHIEF U.S. DISTRICT JUDGE**

---

[3] Martin also includes in his motion a request for a recommendation of home confinement. ECF No. 90 at 13.  I deny this motion for the same reasons that I deny Martin's motion for compassionate release.  *See Delacruz,* 2020 WL 3270503, at *6 ("Construing Delacruz's request as one for a judicial recommendation that BOP release him to home confinement, the court denies that request for the same reasons it has denied Delacruz's motion for compassionate release.").